IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN ROE,                                     )
                                              )
                Petitioner,                   )
        v.                                    )
                                              )     Case No. 3:25-cv-128
LEONARD ODDO, *Warden, Moshannon*             )     Judge Stephanie L. Haines
*Valley ICE Processing Center*, et al.,       )
                                              )
                Respondents.                  )

## OPINION

On April 30, 2025, Petitioner John Roe ("Petitioner"), through counsel, filed a Petition for Writ of Habeas Corpus (the "Petition"), ECF No. 1, and a Motion for a Temporary Restraining Order ("T.R.O.") and/or Preliminary Injunction ("P.I.") with an accompanying Brief in Support. ECF Nos. 2, 4. On May 2, 2025, the Court denied Petitioner's Motion for a T.R.O. and/or P.I. "insofar that it s[ought] relief via a temporary restraining order[]" because Petitioner "failed to show that any injury, loss, or damage w[ould] occur before Respondents[:]" Leonard Oddo (in his official capacity as Warden of Moshannon Valley Processing Center), Brian McShane (in his official capacity as Acting Field Office Director of the Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") Philadelphia Field Office), Kristi Noem (in her official capacity as Secretary of the Department of Homeland Security ("DHS")), and Pam Bondi (in her official capacity as Attorney General of the United States) (collectively, "Respondents") "c[ould] be heard in opposition[.]" ECF No. 7. Regarding Petitioner's remaining request for a P.I., the Court directed briefing from the parties, held a hearing, and permitted the parties to file supplemental documents. ECF Nos. 19–20. The Court entered an Opinion, ECF No. 22, and an accompanying Order, ECF No. 23, on July 9, 2025, denying Petitioner's Motion for a Preliminary Injunction.

Currently pending before the Court is Petitioner's August 5, 2025, Motion ("Motion"), which includes a Motion for Reconsideration, a Renewed Motion for a P.I., and a Motion to Compel Discovery or Conduct Discovery. ECF No. 25. In Petitioner's Brief in Support of his Motion, he cites factual developments that occurred after the Court's July 9th Order to contend that he "meets all the criteria for a preliminary injunction now" and should be granted emergent relief via either his Renewed Motion for a P.I. or through the Court's reconsideration of its July 9th Opinion and Order. *See* ECF No. 26, p. 2. After the Court entered an Order on August 28, 2025, setting briefing deadlines, ECF No. 27, Respondents timely filed a Response in Opposition to Petitioner's Motion on September 5, 2025, ECF No. 28, and Petitioner timely replied on September 8, 2025. ECF No. 29. The Court conducted a hearing on the matter on September 25, 2025. ECF Nos. 30, 31. The Motion is ripe for disposition.

For the following reasons, the Court will DENY the Motion as to Petitioner's request for reconsideration of its July 9th Opinion and Order,[1] DENY the Motion as to Petitioner's renewed request for a P.I., and GRANT IN PART and DENY IN PART the Motion as to Petitioner's request to Compel Discovery or Conduct Discovery.

## I.     Procedural History and Factual Background

Petitioner sets forth that, when he was around ten years old, he "was abducted from his home somewhere in Southern Asia, likely in either India or Sri Lanka" and was "brought to [California] via ship." ECF No. 1, ¶¶ 19–20. According to the Declaration of Supervisory Detention and Deportation Officer Kirby Tejeda (the "Tejeda Declaration"),[2] "Petitioner came to

---

[1] Petitioner raises factual developments that occurred after this Court issued its July 9th Opinion and Order. However, as will be explained in this Court's adjudication of Petitioner's Renewed Motion for a P.I., these new facts do not alter the outcome of that decision; Petitioner is not entitled to a P.I. at this time. *See infra* Section II.a.

[2] The Court notes that it largely derives the following facts from the Tejeda Declaration because, at the June 11, 2025, hearing, counsel for Petitioner stipulated to the factual timeline of the events detailed therein—but for the factual assertions set forth in both Paragraphs 14 and 18.

DHS['s] attention pursuant to an April 8, 1994, [criminal] conviction for Sodomy: Deviate intercourse with another person and sexual abuse[, for which] Petitioner was sentenced to one to three years['] incarceration." ECF No. 9-1, ¶ 3. On or about May 17, 1994, ICE initiated removal proceedings against Petitioner, charging him as removeable under § 241(a)(1)(B) of the Immigration and Nationality Act ("INA"). *Id.*

On April 19, 1995, Petitioner was detained by ICE and remained in ICE detention during the pendency of his removal proceedings which culminated on July 27, 1995, when an Immigration Judge ordered Petitioner's removal to India. *Id.* at ¶ 4–5. Petitioner appealed that Order to the Board of Immigration Appeals (the "BIA"), but the BIA dismissed his appeal on December 4, 1995, rendering the Immigration Judge's July 27th Order of removal final. *Id.* at ¶ 4.

In June 1996, ICE released Petitioner on his own recognizance. *Id.* at ¶ 6. However, Petitioner was re-detained by ICE in August 2003, after he was charged with: (1) possessing a weapon of mass destruction, (2) possessing a firearm as a felon, and (3) operating a video game store without a license, and he pled guilty to the possession of a firearm by a felon charge. ECF No. 19 at 5; ECF No. 9-1, ¶ 8. Thereafter, in June 2005, ICE released Petitioner on an Order of Supervision ("OSUP"). *Id.* at ¶¶ 9, 12. Eight years later, after Petitioner failed to register as a sex offender, he was again re-detained by ICE upon his release from the Nassau County Correctional Center. *Id.* at ¶ 15. On June 24, 2013, the same day ICE re-detained Petitioner, it released him on an OSUP due to a prior leg injury. *Id.*

Over the decade between Petitioner's re-detention in 2003 and the months following his release in 2013, Petitioner failed to comply with ICE removal efforts by: failing to appear for removal despite a notice, failing to complete his travel document application on multiple occasions, and failing to provide proof that travel document applications were submitted to two

3

additional countries. *Id.* at ¶¶ 10–13, 16–17. Due to Petitioner's failure to comply with ICE policy, he was issued both a failure to comply ("FTC") and an I-229a form. *Id.* at ¶¶ 11, 17.

Petitioner's current detention began "[o]n or about January 26, 2025." *Id.* at ¶ 18. According to the Tejeda Declaration, "[Petitioner] was taken into custody relative to a changed circumstance" in that "it [wa]s believed with the new immigration policies there [wa]s a [significant likelihood of removal in the reasonably foreseeable future] for criminal aliens [such as Petitioner]." *Id.* at ¶ 18.[3] Once in custody, ICE provided Petitioner with travel document applications to complete on three separate occasions. *Id.* at ¶ 19. On May 1, 2025, Petitioner submitted an incomplete travel document application packet which was to be provided to the Indian Consulate for travel document issuance. *Id.* at ¶¶ 20–21. Simultaneously, Removal and International Operations ("HQ-RIO") was requested to assist the Indian Consulate for the issuance of a travel document. *Id.* at ¶ 21. As such, it was anticipated that the Indian Consulate would issue Petitioner a travel document and that he would be removed within thirty days of the issuance. *Id.* at ¶ 24. Before Petitioner's travel document application was officially submitted to the Indian Consulate, ICE reviewed Petitioner's custody status and determined that he would be held in continued detention because he posed a threat to public safety and had a final order of removal. ECF No. 9-4, p. 1.

On April 30, 2025, Petitioner filed a Petition for Writ of Habeas Corpus, ECF No. 1, and a Motion for a Temporary Restraining Order ("T.R.O.") and/or Preliminary Injunction ("P.I."), ECF No. 2, alongside an accompanying Brief in Support. ECF No. 4. In his underlying Petition, Petitioner asserts that when ICE revoked his OSUP and detained him in January 2025, it

---

[3] The Court noted in its July 9th Opinion that: "The new immigration policy referenced appears to be Section Eight of Executive Order 14165, entitled Securing Our Borders, signed by President Donald J. Trump on January 20, 2025, 90 Fed. Reg. 8467." ECF No. 22, p. 3, n. 3.

"violate[d:] the Immigration and Nationality Act and its attendant regulations, the Administrative Procedure Act, and the Fifth Amendment of the U.S. Constitution." ECF No. 1, ¶ 4. Petitioner further contends in his habeas petition that his continued detention is unlawful as his removal is not reasonably foreseeable and the amount of time he has been detained by ICE has surpassed the six-month period the Supreme Court presumed to be reasonable in *Zadvydas v. Davis*, 533 U.S. 678 (2001).[4] *Id.* at pp. 18–19. In his April 30, 2025, Motion for a T.R.O. and/or a P.I., Petitioner reiterates the claims set forth in his underlying habeas petition, and contends, in the alternative that "his failing health and significant medical needs qualify as "exceptional circumstances'" that justify his "immediate release from detention" on bond under *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986). ECF No. 4, p. 7.

As noted above, the Court denied Petitioner's April 30th Motion for a T.R.O. and/or a P.I., on May 2, 2025, "insofar that it s[ought] relief via a temporary restraining order[]" because Petitioner "failed to show that any injury, loss, or damage w[ould] occur before Respondents c[ould] be heard in opposition[.]" ECF No. 7. Regarding Petitioner's remaining request for a P.I., the Court directed briefing from the parties, held a hearing on the matter, and permitted

---

[4] This claim hinged upon the argument that the fragmented periods of time Petitioner spent in ICE detention between 1995 and the date Petitioner's underlying habeas petition was filed, April 30, 2025, should be aggregated. ECF No. 1, pp. 18–19. Only by aggregating the time Petitioner spent in detention could he contend that his detention had extended beyond the six-month period the Supreme Court presumed to be reasonable in *Zadvydas*. This is because, at the time of filing, Petitioner had only been in ICE custody for three consecutive months—he was re-detained on January 26, 2025. *See* ECF No. 9-1, ¶ 18. While the Court did not need to determine the merits of Petitioner's aggregation argument in its July 9th Opinion because removal was reasonably foreseeable, it nonetheless explained:

> Neither the Supreme Court nor the Third Circuit have ruled on the aggregation of post-removal time when such detention is interrupted by release pursuant to an OSUP. District courts in this Circuit have voiced skepticism of such an approach. *See, e.g.*, *Nma v. Ridge*, 286 F. Supp. 2d 469, 476 n.2 (E.D. Pa. 2003) ("It is not clear to the court, nor does the court necessarily agree, that the length of the petitioner's detention should be aggregated to include time he was detained prior to his release on an order of supervision. Each detention had its own particular set of circumstances."). This Court is skeptical of such an approach as well...

ECF No. 22, p. 11, n.6. The Court does note, however, that, this aggregation argument is no longer necessary to allege a prima facie *Zadvydas* claim as Petitioner has remained in ICE custody for nearly nine consecutive months as of the writing of this Opinion.

supplemental documents to be filed. ECF Nos. 19–20. On July 9, 2025, the Court issued an

Opinion, ECF No. 22, and accompanying Order, ECF No. 23, denying Petitioner's Motion for a

P.I.

In this Court's July 9th Opinion, the Court found that it had jurisdiction to adjudicate

Petitioner's claims "[i]nsofar as the allegations w[ere]…separate and apart from removal

proceedings[.]" ECF No. 22, p. 5. Based on the briefing of the parties and the record before it at

the time, this Court found: (1) that ICE was acting pursuant to 8 C.F.R. § 241(*l*)(2)—rather than 8

C.F.R. § 241.13—and (2) that ICE's decision to revoke Petitioner's OSUP and re-detain him did

not violate the INA, APA, or due process but was rather a lawful exercise of its discretion. *Id.*

Relative to Petitioner's *Zadvydas* claim of unlawful detention, this Court found that, even if it

assumed that Petitioner had been detained past the six month period presumed reasonable in

*Zadvydas*, Petitioner failed to demonstrate a likelihood of success on the merits because he failed

to produce "any evidence that there [wa]s no significant likelihood of removal[;]" instead,

Respondents demonstrated that India was anticipated to issue travel documents, rendering

Petitioner's removal anticipated within 30 days. *Id.* at p. 12.

On July 31, 2025, subsequent to this Court's July 9th Opinion, the Indian Consulate met

with Petitioner, his counsel, and ICE's Deportation Officer and informed Petitioner that India

would not issue him travel documents. ECF No. 26, p. 5; ECF No. 28, p. 3. Since that meeting,

Petitioner has remained in ICE custody[5] while ICE "is proceeding with review and additional

requests for acceptance for the issuance of travel documents to third countries[,]" ECF No. 28, p.

---

[5] Petitioner has now been in custody for over six months—he has been in continuous detention since he was re-detained by ICE on January 26, 2025. Thus, Petitioner does not instantly rely upon a theory of aggregation to substantiate his *Zadvydas* claim.

6, in addition to, apparently, continuing discussions with India as to issuance of a travel document for Petitioner. *See* ECF No. 28-2.

While Petitioner has remained in ICE custody, he has been issued at least two notices regarding the decision to continue his detention. *See* ECF Nos. 9-4, 28-2. The first notice—issued on May 8, 2025, by David O'Neill, Deputy Field Office Director of ICE—explained that Petitioner was to remain in custody as ICE determined that he is a threat to public safety and has a final order of removal, ECF No. 9-4; however, the second notice—issued on August 25, 2025, by James Dobson, HQ-RIO Unit Chief—explained that Petitioner is to remain in ICE custody as ICE is currently working with the government of India to secure a travel document, is expecting a travel document to be procured, and thus, has reason to believe there is a significant likelihood that Petitioner will be removed in the reasonably foreseeable future. ECF No. 28-2.

On August 5, 2025, Petitioner filed the instant Motion—which includes a Motion for Reconsideration, a Renewed Motion for a P.I., and a Motion to Compel Discovery or Conduct Discovery—ECF No. 25, alongside an accompanying brief in support. ECF No. 26. Therein, Petitioner contends that he "meets all the criteria for a preliminary injunction now" due to India's decision to not issue him a travel document; he thus contends that he should be granted emergent relief via either his Renewed Motion for Preliminary Injunction or through the Court's reconsideration of its July 9th Opinion and Order. *See* ECF No. 26, p. 2.

## II.     Analysis

### a.    Petitioner's Motion for Reconsideration and Renewed Motion for a Preliminary Injunction

The purpose of a motion for reconsideration "'is to correct manifest errors of law or fact or to present newly discovered evidence.'" *Kabacinski v. Bostrom Seating, Inc.,* 98 F.App'x. 78, 81 (3d Cir. 2004) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). Because

"federal courts have a strong interest in the finality of judgments . . ." *United States v. Hoey*, No. CR 09-200, 2011 WL 748152, at *2 (W.D. Pa. Feb. 15, 2011) (internal quotations omitted), the standard that must be met to prevail on a motion for reconsideration is high. *See Berry v. Jacobs IMC, LLC*, 99 F.App'x. 405, 410 (3d Cir. 2004). The Court may grant a motion for reconsideration if the moving party shows: "(1) an intervening change in the controlling law; (2) the availability of new evidence which was unavailable when the Court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice."[6] *United States v. Banks*, No. CR 03-245, 2008 WL 5429620, at *1 (W.D. Pa. Dec. 31, 2008) (citing *Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). In this context, "new evidence" refers to "evidence that a party could not earlier submit to the court because that evidence was not previously available;" it "does not refer to evidence that a party [simply] obtains or submits to the court after an adverse ruling." *Howard Hess Dental Laboratories, Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237, 252 (3d Cir. 2010).

"Motion[s] for reconsideration are not a tool to re-litigate and reargue issues which have already been considered and disposed of by the court," *Hoey*, 2011 WL 748152, at *2 (citation omitted), to express "disagreement with the court's rulings," *United States v. Perminter*, No. CR 10-204, 2012 WL 642530, at *7 (W.D. Pa. Feb. 28, 2012), or for addressing arguments that a party should have raised earlier. *See United States v. Dupree*, 617 F.3d 724, 732–33 (3d Cir. 2010).

---

[6] While Petitioner's Motion for Reconsideration may best be viewed as a Motion for Reconsideration under Federal Rule of Civil Procedure 54, *see Qazizadeh v. Pinnacle Health System*, 214 F.Supp.3d 292, 295 (M.D. Pa. 2016) ("[M]otions for reconsideration of interlocutory orders—whether denials of summary judgment, grants of partial summary judgment, or any other non-final orders—are motions under Federal Rule of Civil Procedure 54(b)"), the "extraordinary circumstance" standard applied to motions for reconsideration under Rule 54 mirrors, almost exactly, the familiar standard applied to such motions under Rule 59. *See In re Pharmacy Benefit Managers Antitrust Litigation*, 582 F.3d 432, 439 (3d Cir. 2009) (explaining that the extraordinary circumstances in which "a court [is not prohibited] from revisiting its own decisions or one of a coordinate court[ are:] where (1) new evidence is available or (2) a supervening new law has been announced. . .[or, (3)] it appears that a previous ruling, even if unambiguous, might lead to an unjust result.") (internal citations omitted). Thus, the Court utilizes the more familiar articulation of this standard in the context of Rule 59 motions.

Rather, such a motion is appropriate only when the court misunderstood a party or where there has been a significant change in law or facts since the court originally ruled on that issue. *Hoey*, 2011 WL 748152, at *2.[7]

Here, Petitioner asserts that because of: (1) "new evidence, along with [what Petitioner believes to be] . . . misinterpretation[s] of the legal standards of *Zadvydas* and *Matthews v. Eldridge*, 424 U.S. 319, (1976), [(2)] factual errors contained in [the Court's] first opinion, and [(3) Petitioner]'s medical crises that have been exacerbated and largely gone untreated while in immigration detention, this Court should reconsider its prior ruling and order [Petitioner]'s immediate release." ECF No. 26, p. 5. Primarily, Petitioner cites to India's July representation that it would not issue him a travel document as "new evidence" that renders reconsideration appropriate and demonstrates that Petitioner's "removal is *not* reasonably foreseeable[,]" entitling him to relief. *Id.* at pp. 7–8 (emphasis in original).

Indeed, India's July 31, 2025, decision to deny issuance of Petitioner's travel documents after this Court ruled on Petitioner's Motion for P.I. significantly changes the factual landscape of the case as it stands today. However, for Petitioner to succeed on his instant claims and be afforded the relief he requests—whether via his Motion for Reconsideration or his Renewed Motion for a P.I.—he must demonstrate that he is entitled to such relief on the merits of his claims and in light of the entire factual and legal record before the Court. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) ("[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction.") (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir.

---

[7] Additionally, counsel for Petitioner must note that neither zealous representation of a client nor articulation of the ground(s) upon which it is believed the Court misunderstood, or erred, necessitate or permit counsel to forget proper decorum and respect in its written briefing.

1982)). As both Petitioner's Motion for Reconsideration and Renewed Motion for a P.I. hinge on the same law and facts, the Court will address both in one breath. The Court will evaluate the merits of Petitioner's claims below.

### i.      Petitioner's Request for a P.I. Directing Immediate Release

"Preliminary Injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Securities & Exchange Commission v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024) (quoting *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014)) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that[; (1)] he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017); *Maldonado v. Houston*, 157 F.3d 179, 184 (3d Cir. 1998). "[A] movant for preliminary equitable relief *must* meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits. . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. *If these gateway factors are met*, a court then considers the remaining two factors[.]" *Reilly*, 858 F.3d at 179; *see also Greater Phil. Chamber of Com. v. City of Phil.*, 949 F.3d 116, 133 (3d Cir. 2020).

### A.  Petitioner's *Zadvydas* Claim
### 1.  Jurisdiction

This Court has jurisdiction to adjudicate Petitioner's *Zadvydas* claim. *See Zadvydas*, 533 U.S. at 688 ("[H]abeas corpus proceedings remain available as a forum for statutory and constitutional challenges to *post-removal-period* detention.") (emphasis added). The Supreme

Court, in *Zadvydas*, explained the jurisdictional basis on which a district court may adjudicate

post-removal-period detention claims.

> [T]he primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction
> upon the federal courts to hear these [post-removal-period detention] cases. *See* §
> 2241(c)(3) (authorizing any person to claim in federal court that he or she is being
> held "in custody in violation of the Constitution or laws ... of the United
> States")...[Moreover, while] statutory changes [occurred between 1952 and 1996,
> those changes] left habeas untouched as the basic method for obtaining review of
> continued *custody after* a deportation order had become final. *See Cheng Fan
> Kwok v. INS,* 392 U.S. 206, 212, 215–216 (1968) (holding that § 1105a(a) applied
> only to challenges to determinations made during deportation proceedings and
> motions to reopen those proceedings).

*Zadvydas*, 533 U.S. at 687 (emphasis provided). The Supreme Court continued to explain the effect

of the post 1996 statutory developments on post-removal-period detention claims by noting that

while, "Congress has enacted several statutory provisions that limit the circumstances in which

judicial review of deportation decisions is available[,]" "none [of those provisions] appl[y]" to

*Zadvydas* type claims. *Id.* at 688. That is because *Zadvydas* claims do not "seek review of the

Attorney General's exercise of *discretion*; rather [such claims] challenge the extent of the Attorney

General's *authority* under the post-removal-period detention statute." *Id.* (collecting statutes under

the INA, including 8 U.S.C. § 1252(g), that impose jurisdictional limitations upon judicial review

of discretionary decisions made by the Executive Branch relative to immigration) (emphasis

added); *see also Garcia v. Attorney General of U.S.*, 553 F.3d 724, 729 (3d Cir. 2009) (finding

that the jurisdictional bar in 8 U.S.C. § 1252(g) was not implicated because the petitioner was "not

challenging the discretionary *decision* to commence proceedings, but [wa]s challenging the

government's very *authority* to commence those proceedings after the limitation period

[established in 8 U.S.C. § 1256(a)] ha[d] expired.") (emphasis provided). Thus, as Petitioner is

challenging the Attorney General's authority under the post-removal-period detention statute to

continue Petitioner's detention, this Court possesses jurisdiction to address the merits of Petitioner's *Zadvydas* claim below.

### 2. Legal Standard

In *Zadvydas*, the Supreme Court decided that 8 U.S.C. § 1231(a)(6), the post-removal-period statute, authorizes the Government to detain a removable alien "only for a period *reasonably necessary* to secure the alien's removal," rather than "*indefinitely* beyond the removal period." 533 U.S. at 682 (emphasis in original). In attempts to "guide lower court determinations" and "for the sake of uniform administration in the federal courts[,]" the *Zadvydas* Court recognized six months as a presumptively reasonable period of post-removal detention. *Id.* at 701. Still, the Court explained that the presumptively reasonable time-period is merely a presumption, not an ironclad timeframe. *Id.* ("This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."). As such, after the six-month period has passed, the alien bears the burden to adduce "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future[;]" once such a showing is made, the burden shifts to the Government and it must then "respond with evidence sufficient to rebut that showing." *Id.*; *see also Barenboy v. Attorney General*, 160 F. App'x 258, 261 n.2 (3d Cir. 2005).

In the context of this burden shifting framework, there is an inverse relationship between the time the alien has been detained post-removal and the showing the Government must make in rebuttal. *Zadvydas*, 533 U.S. at 701. ("[F]or detention to remain reasonable, as the period of prior post[-]removal confinement grows, what counts as the 'the reasonably foreseeable future' conversely [] ha[s] to shrink."). For this reason, the same evidence that may be sufficient for the

Government to rebut an alien's proffer of good reason to believe that there is no significant likelihood of removal when that alien has been in post-removal confinement for six months and one day may not likewise be sufficient when that same alien has been in post-removal confinement for twelve months and one day. *See generally id.*; *see also Alexander v. Attorney General U.S.*, 495 F. App'x 274, 277 (3d Cir. 2012) (After affirming the district court's determination that the petitioner—an alien detainee who had been in post-removal custody for over one year—had failed to demonstrate that there was no significant likelihood of removal in the reasonably foreseeable future when he simply cited the fact that his travel document application had been pending for eight months, the Third Circuit cautioned the government that "as we have drifted past the one-year mark, concerns will only continue to grow"); *Lin v. U.S. Attorney General Ashcroft*, No. Civ.A. 04-1101, 2004 WL 834728, at *4 (E.D. Pa. Apr. 15, 2004) (noting that although the court deferred to the Executive Branch's assessment of repatriation discussions, "the Court w[ould] scrutinize the government's efforts much more closely" should detention persist and the petitioner need to file a renewed application for relief) (*R&R adopted by Feng v. Ashcroft*, No. 04-CV-1101, 2004 WL 1427133 (E.D. Pa. June 22, 2004)).

### 3. Likelihood of Success on the Merits

Petitioner argues that he is likely to succeed on the merits of his *Zadvydas* claim. Petitioner has been detained by ICE for almost nine consecutive months. *See* ECF No. 9-1, ¶ 18 ("On or about January 26, 2025, Petitioner was taken into [ICE] custody.").[8] Thus, Petitioner asserts that

---

[8] Although Petitioner's initial aggregation argument is not necessary at present to raise a prima facie *Zadvydas* claim, it is germane to the issue of the burden both parties bear in determining whether his continued detention is unreasonable. As such, the Court will directly address the issue here. The Court rejects the aggregation theory advanced by Petitioner relative to calculating the post-removal period of detention for *Zadvydas* purposes. In addition to the discussion begun in this Court's July 9th Opinion as set forth in *supra* note 4, the Court has noted elsewhere that, "[t]his Court is highly skeptical of the argument that detentions from approximately a decade or more ago (such as Petitioner's prior detentions) that are interrupted by an OSUP can be aggregated with a present detention to overcome *Zavydas's* six-month presumption." *Pan v. Oddo*, 3:25-cv-265, ECF No. 9, p. 2, n.1 (W.D. Pa. Aug. 22, 2025). Just as in *Pan*, Petitioner here does not raise any on-point authority that persuasively establishes that such

his detention has surpassed the six-month period presumed to be reasonable in *Zadvydas*. ECF No. 26, p. 10. He further contends that new evidence demonstrates that his removal is not reasonably foreseeable. *Id.* p. 7. Specifically, Petitioner alleges that his removal to India is not reasonably foreseeable because India denied his travel document application as a result of its inability to verify his nationality; he further contends that ICE's failure to indicate that it is considering any other countries for his removal demonstrates that third country removal is not reasonably foreseeable. *Id.* at p. 8. As such, the Court finds that, in his instant Motion, Petitioner has carried his burden of proffering "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," *Zadvydas*, 533 U.S. at 701, due to India's denial of his travel document application. The matter remains as to whether Respondents have rebutted Petitioner's showing.

---

aggregation is permitted when detention is interrupted by release on OSUP for a decade. Rather, Petitioner's argument is undermined by the fact that the *Zadvydas* Court was primarily concerned with firmly establishing that indefinite detention is unlawful. *See* 533 U.S. at 682, 695 ("[T]he issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States."). To aggregate periods of detention from nearly three decades ago to determine whether Petitioner is instantly subject to unreasonable and indefinite detention would be improper. Should this position be adopted, Petitioner's current detention would have fallen outside of the presumptively reasonable period the instant he was re-detained. *See* ECF No. 11, p. 3, n. 2 (indicating that, as of his release in 2013, Petitioner had already spent an aggregated 878 days, or nearly 2.5 years in detention); *see also Barrios v. Ripa*, No. 1:25-cv-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025) ("Petitioner argues that his detention should be counted in the aggregate based upon his prior detentions. However, if the Court counted detentions in the aggregate, any subsequent period of detention, even one day, would raise constitutional concerns.") (citing *Meskini v. Attorney General of United States*, No. 4:14-CV-42-CDL, 2018 WL 1321576, at *4 (M.D. Ga. Mar. 14, 2018)) (finding that *Zadvydas* is not a "Get Out of Jail Free Card that may be redeemed at any time just because an alien was detained too long in the past."). Each individual detention must be evaluated by its own unique factual circumstances to ensure it accords with the law: i.e., lasts only so long as removal is reasonably foreseeable. *See Zadvydas*, 533 U.S. at 699 ("[W]e conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute."); *see also White v. Warden Pike County Correctional Facility*, No. 23-28722024 WL 4164269, at *1 (3d Cir. Sept. 12, 2024) (noting in the context of determining whether a detention has continued for a reasonable time under § 1226(c) that "[r]easonableness is a fact-specific inquiry[.]"). Thus, in order to determine whether Petitioner is currently "condemned to an indefinite term of imprisonment within the United States" after he was re-detained by ICE on January 26, 2025, the Court will base its *Zadvydas* analysis on the nearly nine consecutive months Petitioner has remained in ICE detention following the instant re-detention.

In response to Petitioner's contentions, Respondents assert that Petitioner cannot succeed on the merits of his *Zadvydas* claim. While Respondents do not dispute that Petitioner has been in ICE detention past the six-month period presumed reasonable in *Zadvydas*,[9] they argue that he "fails to demonstrate that removal will not occur in the reasonably foreseeable future." ECF No. 28, p. 6. Respondents allege that Petitioner's case has been elevated "to HQ RIO, and [that] ERO is proceeding with review and additional requests for acceptance for the issuance of travel documents to third countries." *Id.* This representation implicates Petitioner's assertions regarding removal to India as well as third countries.

At the September 25th hearing on the instant Motion, Respondents explained that HQ-RIO—Removal and International Operation Headquarters—is the entity responsible for engaging in diplomatic discussions with other countries to secure agreements for the removal of an alien

---

[9] Respondents do note that Petitioner has "failed to fully cooperate with past efforts" to secure his removal. ECF No. 28, p. 6. In fact, Petitioner has been issued both a failure to comply ("FTC") and an I-229a form due to such noncompliance. ECF No. 9-1, ¶¶ 11, 17. Numerous courts have explained that when an alien detainee does not cooperate with efforts to secure his/her removal, the calculus in an ensuing *Zadvydas* claim is drastically altered. *See e.g., Alexander*, 495 F. App'x at 277 (noting that further development of "whether [the petitioner] actually failed to comply with removal-related instructions[] would be invaluable should this case return. . . on appeal."); *Lema v. U.S. Immigration and Naturalization Service,* 329 F.3d 853, 857 (9th Cir. 2003) ("[W]hen an alien refuses to cooperate fully and honestly with officials to secure travel documents from a foreign government, the alien cannot meet his or her burden to show there is no significant likelihood of removal in the reasonably foreseeable future."); *Pelich v. I.N.S.*, 329 F.3d 1057, 1060 (9th Cir. 2003) ("*Zadvydas* does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock.") (collecting cases in support); *U.S. ex rel. Kovalev v. Ashcroft*, 71 F. App'x 919, 924 (3d Cir. 2003) (approvingly citing *Pelich*, 329 F.3d 1057); *Rene v. Secretary of Department of Homeland Security*, No. 06-336(JAG), 2007 WL 708905, at *3 (D. N.J. Mar. 5, 2007) (finding that the period of time "Petitioner refused to sign the "Fiche Signaletique Du Deporte" form, c[ould not] be factored in any evaluation of feasibility of Petitioner's removal or reasonableness of Petitioner's detention."); *Qing Di Wang v. Carbone*, No. Civ.A. 05-2386JAP, 2005 WL 2656677, at *3 (D. N.J. Oct. 17, 2005) (calculating petitioner's post-removal detention period based upon the date he cooperated with removal efforts rather than the date his post-removal detention began); *Liang v. Bureau of Immigration and Customs Enforcement*, No. 04-cv-1538, 2004 WL 1126276, at *3 (E.D. Pa. May 20, 2004) (setting forth that "the continued detention of a removable alien [is permissible under *Zadvydas*] 'so long as the alien fails to cooperate fully and honestly with officials to obtain travel documents.'") (quoting *Lema,* 329 F.3d at 857); *Lin*, 2004 WL 834728, at *3 (*R&R adopted by Feng*, 2004 WL 1427133). Here, the Court need not alter its *Zadvydas* analysis based upon Petitioner's alleged non-compliance as Respondents have, at this time, rebutted Petitioner's showing relative to the likelihood of his removal to India in the reasonably foreseeable future without the Court taking into account the impact of any potential noncompliance by Petitioner. However, the Court does set forth the matter for the record as Respondents have raised, at least passingly, this issue.

detainee. Due to the diplomatic nature of these proceedings, the products of such discussions remain strictly confidential. As such, Counsel for Respondents indicated at the September 25th hearing that when he inquired as to the developments in said diplomatic discussions over Petitioner's removal, he was not given any information beyond that which was already provided to the Court in briefing.[10] The only information provided from this higher authority is the Decision to Continue Detention issued on August 25, 2025, by HQ-RIO Unit Chief, James Dobson, ECF No. 28-2, which indicates that "ICE is currently working with the government of India to secure a travel document for [Petitioner's] removal from the U.S., a travel document is expected, and ICE has reason to believe that [Petitioner's] removal will occur in the reasonably foreseeable future." ECF No. 28-2. As such, this representation suggests that diplomatic discussions have continued with India following the Court's July denial of Petitioner's travel document application.

Respondents further contend that "India's decision to deny [Petitioner's] travel document application does not prevent his removal to a third country[.]" ECF No. 28, p. 6. In this vein, Respondents also contend that ERO—Enforcement and Removal Operations—"is proceeding with review and additional requests for acceptance for the issuance of travel documents to third countries." *Id.* Respondents assert that a reasonable amount of time is needed to pursue third country options, but that "[o]nce a third country removal opportunity is secured, [Petitioner's] removal is anticipated to be imminent." *Id.*

The Court notes the difficulty of the record before it. On July 9, 2025, this Court found that Petitioner was not likely to succeed on the merits of his *Zadvydas* claim as his "removal proceeding [*to India* wa]s underway." ECF No. 22, p. 12. On July 31, 2025, India informed Petitioner that it

---

[10] Based on this lack of information, counsel for Respondents indicated that he believed that ICE was not continuing to pursue Petitioner's removal to India. Because counsel for Respondents provided this comment in the context of explaining that he was not informed of the intentions of the Executive Branch in removing Petitioner, the Court relies on the representations directly made to the Court by HQ-RIO as to any repatriation discussions.

would not issue him a travel document. ECF No. 26, p. 5; ECF No. 28, p. 3. On August 8, 2025, Petitioner filed the instant Motion contending that due to this development, he "meets all the criteria for a preliminary injunction now" and should be granted emergent relief via either his Renewed Motion for P.I. or through the Court's reconsideration of its July 9th Opinion and Order. *See* ECF No. 26, p. 2. Yet, on August 25, 2025, HQ-RIO, the diplomatic arm of ICE, represented that it is working with India and anticipates a travel document will be issued. ECF No. 28-2. In this way, the Court is left to make a reasonability determination based upon seemingly contradictory facts and assertions that are not fully developed on the record due to the alleged diplomatic negotiations on which they are based. Still, the Supreme Court has provided guidance on this type of quandary.

In explaining that courts are to "take appropriate account of the greater immigration-related expertise of the [E]xecutive [B]ranch, [] the serious administrative needs and concerns inherent in the necessarily extensive INS [now DHS][11] efforts to enforce th[e] complex statute[s], and the Nation's need to 'speak with one voice' in immigration matters" when "review[ing] the lawfulness of an alien's continued detention, the Supreme Court set forth that:

> Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility. They counsel judges to give expert agencies decision [] making leeway in matters that invoke their expertise. See *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 651–652 (1990). They recognize Executive Branch primacy in foreign policy matters. See *Container Corp. of*

---

[11] As explained in this Court's July 9th Opinion,

> Upon the passage of the INA, and for subsequent decades, immigration enforcement and administration were within the purview of the Immigration and Naturalization Service ("INS"). In 2002, however, Congress passed the Homeland Security Act, which abolished the INS, 6 U.S.C. § 291, and transferred the INS's responsibilities to the DHS, including its agency, ICE, *id.* §§ 202, 557. *See Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 659 (3d Cir. 2014). Accordingly, any references to the INS in the INA are now considered to refer to DHS. *See* 6 U.S.C. § 557; *see also Ceesay v. Kurzdorfer*, No. 25-CV-267, 2025 WL 1284720, at *16 (W.D.N.Y. May 2, 2025).

ECF No. 22, p. 2 n. 2.

*America v. Franchise Tax Bd.,* 463 U.S. 159, 196 (1983). And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, *the status of repatriation negotiations*, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

*Zadvydas*, 533 U.S. at 700 (cleaned up) (emphasis added). Thus, this Court gives credence to HQ-RIO's representation that it is "currently working with the government of India to secure a travel document for [Petitioner's] removal from the U.S., [that] a travel document is expected, and [that] ICE has reason to believe that [Petitioner's] removal [or repatriation] will occur in the reasonably foreseeable future." ECF No. 28-2.[12]

Even though Petitioner has carried his initial burden to raise "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," Respondents have responded "with evidence sufficient to rebut that showing" given the period of post-removal confinement and the corresponding impact upon the burden shifting framework. *Zadvydas*, 533 U.S. at 701. Petitioner has been in ICE detention for nearly nine consecutive months. Although Petitioner's post-removal detention has surpassed the presumptively reasonable period, it has only done so by three months. Indeed, India's July 31st decision to deny Petitioner a travel document indicates to an individual without knowledge of potential, ongoing diplomatic negotiations that there is no significant likelihood of removal to India in the reasonably foreseeable future. However, given the fact that Petitioner's post-removal detention has only extended three months past the presumptively reasonable period, the burden of proof has not shifted to such a degree that, at this time, India's July decision can overcome factual representations by the Executive Branch as to

---

[12] The Court notes that India would not be the first country to initially deny travel documents due to insufficient proof of nationality or citizenship only to later agree to issue a travel document. *See Nma v. Ridge*, 286 F.Supp.2d 469, 471 (E.D. Pa. 2003) ("At first, the Liberian government refused to supply the [travel] document without proof that Nma is a Liberian citizen (i.e., a birth certificate or other proof of citizenship or nationality). Later, on August 18, 2003, the Liberian Consulate informed the government that it would, indeed, issue the travel document for Nma.").

further developments in the status of confidential repatriation negotiations. *See Zadvydas*, 533 U.S. at 700 ("[C]ourts [are required] to listen with care when the Government's foreign policy judgments, including, for example, *the status of repatriation negotiations*, are at issue[.]"). Thus, at this time, Petitioner has failed to demonstrate a likelihood of success on the merits of his *Zadvydas* claim.[13] The Court, therefore, denies Petitioner's Motion in so much as it requests a P.I. based upon his *Zadvydas* claim as his removal is reasonably foreseeable in light of the representations from HQ-RIO. ECF No. 28-2. However, the Court does note that with each passing day, the burden continues to shift and "concerns will only continue to grow." *See Alexander*, 495 F. App'x at 277.

## B. Petitioner's OSUP Revocation and Re-detention Claim

Petitioner asserts that when ICE revoked his OSUP and re-detained him in January 2025, it "violate[d:] the Immigration and Nationality Act and its attendant regulations, the Administrative Procedure Act, and the Fifth Amendment of the U.S. Constitution." ECF No. 1, ¶ 4; ECF No. 4, p. 16. Specifically, Petitioner alleges that these violations occurred because ICE failed to follow its own procedures; Petitioner alleges that he had "not received written explanation or even notice of [ICE's] decision to rescind his OSUP and [re-]detain him[,]" ECF No. 4, p. 18, as of the date he filed his initial Motion for a T.R.O. and/or a P.I.—April 30, 2025. ECF No. 2. In light of ICE's

---

[13] Failure to satisfy the first factor of the analysis—a likelihood of success on the merits—necessitates denial of the injunctive request. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989); *see also Reilly*, 858 F.3d at 179 ("[A] movant for preliminary equitable relief *must* meet the threshold for the first two 'most critical' factors[;]" only if those two gateway factors are met does a court consider the remaining two factors). Thus, because Petitioner failed to demonstrate a likelihood of success on the merits, the Court need not further analyze any of the remaining P.I. factors. *See Marvin R.V. v. Tsoukaris*, No. 20-CV-5225, 2020 WL 6689760, at *5 n.2 (D.N.J. Nov. 13, 2020) (collecting Third Circuit cases to support the statement that "[because the p]etitioner has failed to meet his burden with respect to the likelihood of success on the merits, the Court need not address the remaining factors.").

alleged failure to follow proper procedure when it revoked his OSUP and re-detained him, Petitioner requests that this Court order his immediate release. ECF No. 26, p. 18.[14]

## 1. Jurisdiction[15]

While it is abundantly clear that this Court has jurisdiction to adjudicate Petitioner's *Zadvydas* claim, *see supra* Section II.a.i.A.1., the issue of jurisdiction relative to Petitioner's claim involving ICE's decision to revoke his OSUP and re-detain him is more nuanced and requires deeper examination.

"[T]o prevent removal proceedings from becoming fragmented, and hence prolonged. . ."Congress used complementary provisions to funnel removal-related claims away from district courts and into a petition for review in a single court of appeals[;] [s]ometimes, the provisions overlap." *Tazu v. Attorney General United States*, 975 F.3d 292, 296 (3d Cir. 2020) (citing 8 U.S.C. § 1252(b)(9) and (g); *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483 (1999)) (cleaned up) (internal quotations omitted). At issue here are two overlapping provisions that restrict a district court's jurisdiction to adjudicate claims involving: (1) issues related to removal, and (2) issues committed to the discretion of the Executive Branch—8 U.S.C. § 1252(b)(9) and § 1252(g).

---

[14] Petitioner further contests which regulation applied when ICE revoked his OSUP and re-detained him in January 2025. ECF No. 26, p. 15–17. For the reasons that follow, this Court does not have jurisdiction to address Petitioner's contention that ICE's actions were governed by a more stringent standard under 8 C.F.R. § 241.13(i)(2) as opposed to the more discretionary standard under 8 C.F.R. § 241.4(*l*)(2).

[15] While this Court addressed the jurisdictional issues relative to Petitioner's OSUP revocation and re-detention claim in its July 9th Opinion, it did so relative to the APA and 8 U.S.C. 1252(a)(2)(B), ECF No. 22, p.13, n.7, in accordance with the briefing provided from the parties. ECF No. 4, pp. 16–21; ECF No. 9, pp. 11–13. However, this Court did not address the impact of 8 U.S.C. § 1252(b)(9) and (g) upon the issue of its ability to adjudicate Petitioner's claim relative to his OSUP revocation and re-detention specifically. *See* ECF No. 9, pp. 8–9. As such, the Court does so here. *See Hamer v. Neighborhood Housing. Services of Chicago*, 583 U.S. 17, 20 (107) ("[C]ourts are obliged to notice jurisdictional issues and raise them on their own initiative."); *see also United States v. Kalb*, 891 F.3d 455, 459 (3d Cir. 2018).

"Section 1252(b)(9) is colloquially known as the 'zipper clause'[.]" *Trabelsi v. Crawford*,

No. 1:24-cv-1509, 2024 WL 5497113, at *5 (E.D. Va. Dec. 2, 2024). It states:

> Judicial review of *all* questions of law and fact including interpretation and application of constitutional and statutory provisions, arising from *any action taken* or proceeding brought *to remove an alien from the United States* under this subchapter shall be available *only* in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9) (emphasis added). In this way, "§ 1252(b)(9) funnels" "*any claim* "aris[ing]

from *any action* taken. . . to remove an alien" "into a petition for review[,]" which is to be "filed

with the appropriate court of appeals." *Tazu*, 975 F.3d at 294, 299 (emphasis added).[16]

In contrast to § 1252(b)(9), § 1252(g) "does not sweep broadly." *Id.* at 296. Section

1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear *any cause or claim* by or on behalf of any alien *arising from the decision or action* by the Attorney General *to* commence proceedings, adjudicate cases, or *execute removal orders* against any alien under this chapter.

8 U.S.C. § 1252(g) (emphasis added). This "provision applies only to three discrete actions that

the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate*

---

[16] Importantly, the Third Circuit has clarified that while § 1252(b)(9) greatly limits the claims which may be raised outside of a petition for review, it "does not foreclose *all* claims by an immigration detainee." *Tazu*, 975 F.3d at 299 (emphasis added). For example, an alien detainee may pursue a challenge to the length of his confinement outside a petition for review. *See id.* (citing *E.O.H.C. v. Secretary United States Department of Homeland Security*, 950 F.3d 177, 186 (3d Cir. 2020)). Because "[c]hallenges to the length or conditions of an alien's confinement are not directly about removal . . . the Act does not funnel them into a petition for review. *Id.* These claims may be raised outside of a petition for review because, '[f]or these claims, review is now or never.'" *Id.* (quoting *E.O.H.C.*, 950 F.3d at 180); *see also supra* Section II.a.i.A.1. "[B]y contrast, [a] re-detention challenge *is* directly about removal[;]" as a result, whether the claim is analyzed "under § 1252(g) or § 1252(b)(9), the outcome is the same: the District Court lack[s] jurisdiction to hear it." *See Tazu*, 975 F.3d at 299 (emphasis provided).

cases, or *execute* removal orders.'" *Reno*, 525 U.S. at 482 (quoting 8 U.S.C. § 1252(g)) (emphasis provided); *see also Tazu*, 975 F.3d at 296 (Section 1252(g) "reaches only these three specific actions, not everything that arises out of them.") (citing *Jennings v. Rodriguez*, 583 U.S.281, 292–94 (2018)). Despite the fact that § 1252(g) is much narrower than §1252(b)(9), it served the unique function of applying to "'transitional cases' that is, cases pending on the effective date of the IIRIRA[—Illegal Immigration Reform and Immigrant Responsibility Act of 1996,]" and "it serves the continuing function of making clear that those specified decisions and actions, which . . . some courts had held *not* to be included within the non-final-order review prohibition of [8 U.S.C.] §1105a,[17] *are* covered by the 'zipper' clause of § 1252(b)(9)." *Reno*, 525 U.S. at 483.

The Third Circuit has addressed instances where these two provisions overlap and work together, clarifying that Congress intended for claims challenging the revocation of OSUP and re-detention for the purpose of executing a final order of removal to be funneled into a petition for review—which only the appropriate court of appeals has jurisdiction to adjudicate. *See Tazu*, 975 F.3d at 294 ("Section "1252(g) strips us of jurisdiction to review the Attorney General's 'decision or *action* … to … execute removal orders against any alien[,]" while "§ 1252(b)(9) makes a petition for review—not a habeas petition—the exclusive way to challenge 'any action taken or proceeding brought to remove an alien.'") (quoting 8 U.S.C. § 1252(b)(9)); *see also Jennings*, 583 U.S. at 293–94 (noting that 8 U.S.C. § 1252(b)(9) "does not present a jurisdictional bar" where petitioners "are *not challenging* the decision to detain them in the first place.") (emphasis added); *Trabelsi*, 2024 WL 5497113, at *6 ([A] plurality of the Supreme Court has indicated" that "the

---

[17] 8 U.S.C. § 1105a, *repealed by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104-208, Div. C, Title III, § 306(b), Sept. 30, 1996, 110 Stat. 3009-612. At the same time, "Congress amended the Immigration and Nationality Act to add § 1252(b)(9) and (g)." *Tazu*, 975 F.3d at 296; *see also Pub.L. 104-208, Div. C, Title III, § 306, 110 Stat., 3009-612*.

decision to detain [a petitioner] in the first place… falls within the ambit of [s]ection 1252(b)(9)'s jurisdiction stripping provisions.") (citing *Jennings*, 583 U.S. at 294).

In *Tazu*, the Third Circuit evaluated, among other issues, an alien detainee's "challenge[ to] his detention" and his argument "that the Government violated its own regulations and thus due process by detaining him without notice, a revocation interview, and an orderly departure." *Id.* at 295–96. Tazu entered the United States unlawfully in 1993. *Id.* at 294. During removal proceedings in 2001, an Immigration Judge granted Tazu's request to leave voluntarily. *Id.* Tazu appealed to the BIA raising an ineffective assistance of counsel claim, which, in 2003, the BIA denied, giving Tazu thirty days to voluntarily depart. *Id.* When Tazu did not voluntarily leave, "his grant of voluntary departure became an order of removal." *Id.* Tazu was subsequently detained while the Government attempted to remove him to his native country of Bangladesh; however, because "it seemed unlikely that a passport would be issued in the foreseeable future[,]" the Government released Tazu in 2009 on OSUP. *Id.* (cleaned up). Tazu remained on OSUP for the next decade and fully complied with the terms of his supervised release. *Id.* at 295. Yet, in 2019, the Government obtained a passport for Tazu and, three days later, "it re-detained him to execute his removal order." *Id.* at 295, 298. Tazu challenged the Government's decision to revoke his OSUP and re-detain him "without first giving him notice and a revocation interview[,]" arguing that this "violated the agency's rules and thus due process." *Id.* at 299 (citing 8 C.F.R. § 241.4(*l*)(1)).

After Tazu's claims wound through the judicial system, he appealed to the Third Circuit which "construe[d] 8 U.S.C. § 1252(b)(9) and (g) "to decide whether the District Court had jurisdiction[.]". *Id.* at 295. The Third Circuit explained that Tazu's challenge to the Government's decision to re-detain him in order to execute his removal order did "not challenge the Attorney

General's *decision* to execute his removal order, [but] it d[id] attack the *action* taken to execute that order. So under § 1252(g) and (b)(9), the District Court lacked jurisdiction to review it." *Id.* 298.

In reaching this conclusion, the Third Circuit first evaluated the narrower jurisdiction bar, § 1252(g), and found that "[t]he text of § 1252(g) resolve[d] th[at] claim." *Id.* This was the case because, "to perform or complete a removal, the Attorney General must exercise his discretionary power to detain an alien." *Id.* As such, "detention does not fall within some other 'part of the deportation process[,]'" *id.* (quoting *Reno*, 525 U.S. at 482), but falls squarely within the "decision or action by the Attorney General to…execute [a] removal order"—a decision or action that is insulated from judicial review outside of a petition for review. *See* 8 U.S.C. § 1252(g); *Tazu*, 975 F.3d at 298–99. Thus, the Third Circuit explained that, when re-detention is "simply the enforcement mechanism the Attorney General pick[s] to execute [an alien's] removal… § 1252(g) funnels review away from the District Court.…" *Id.*[18]

In applying the broader § 1252(b)(9) to the situation, the Third Circuit began by noting "that if a claim 'aris[es] from any action taken or proceeding brought to remove an alien,' then review of that claim 'shall be available only in judicial review of a final order.' In other words, § 1252(b)(9) funnels that claim into a petition for review.'" *Id.* at 299 (quoting 8 U.S.C. §

---

[18] While it is true that the Third Circuit held "that a *brief* door-to-plane detention is integral to the act of execut[ing] [a] removal order[ ][,]" *Tazu*, 975 F.3d at 298 (emphasis added) (alterations provided) (internal quotation marks omitted), there is no indication that the duration of the detention impacted the Third Circuit's determination that § 1252(b)(9) and (g) bar a district court from adjudicating claims involving revocation of OSUP and re-detention. Rather, the Third Circuit explained that, "[i]f Tazu had challenged the length of his confinement…he could have pursued that challenge outside a petition for review[;] [t]hat is because prolonged detention suggests that removal is not reasonably foreseeable." *Tazu*, 975 F.3d at 299 (citing *E.O.H.C.*, 950 F.3d at 186; *Demore*, 538 U.S. at 527; *Zadvydas*, 533 U.S. at 690) (internal citations omitted). As such, the Third Circuit has made clear that § 1252(b)(9) and (g) prevent a court from adjudicating a challenge involving OSUP revocation and re-detention outside of a petition for review, but it does not bar a *Zadvydas* type claim challenging the length of that detention. *See Tazu*, 975 F.3d 298–99 (emphasis added); *Zadvydas*, 533 U.S. 687–88; *supra* Section II.a.i.A.1; *see also German Santos v. Warden Pike County Correctional Facility*, 965 F.3d 203, 210 (3d Cir. 2020) (permitting: (1) an alien to raise a claim, before his final order of removal has become final, that his prolonged detention under § 1226(c) without a bond hearing violates the Due Process Clause and (2) a court to adjudicate such a claim outside of a petition for review).

1252(b)(9)). Because § 1252(b)(9) applies specifically to actions taken or proceedings brought to "remove an alien[,]" the Third Circuit explained that, "'[t]o remove an alien' means to send him back permanently to his home country [or designated country of removal.]" *Id.* (citing *E.O.H.C.*, 950 F.3d at 184) (internal quotations added) (quoting 8 U.S.C. § 1252(b)(9)). Thus, it follows, that when the Attorney General re-detains an alien so that he may be removed to the country designated in his final order of removal, "the legal questions [an alien] raises about the scope of the Attorney General's discretion to re-detain him are bound up with (and thus 'aris[e] from') an 'action taken' to remove him[.]" *Id.* Therefore, the Third Circuit found that Tazu's "re-detention challenge *is* directly about removal[;]…[thus,] under § 1252(g) or § 1252(b)(9), the outcome is the same: the District Court lacked jurisdiction to hear it." *Id.*

Here, Petitioner challenges ICE's decision to revoke his OSUP and re-detain him, arguing that when it did so, it violated the INA, APA, and Due Process Clause because it failed to: (1) follow its own procedures, (2) provide him with notice, or (3) provide him with a written explanation of its decision. *See* ECF No. 1, ¶ 4; ECF No. 4, pp. 16, 18, 20. In this way, Petitioner's claim directly mirrors that which the Third Circuit addressed in *Tazu*. *See* 975 F.3d at 295–96 (Tazu "challenge[d] his detention, arguing that the Government violated its own regulations and thus due process by detaining him without notice, a revocation interview, and an orderly departure."). Here, just as in *Tazu*, Petitioner's OSUP was revoked for the purpose of removing him to the country designated in his final order of removal. *See id.* at 299; ECF No. 9, p. 9 ("[Petitioner] was detained on January 26, 2025, for the purpose of executing his removal order."); ECF No. 9-2, ("On July 27, 1995, the immigration judge ordered [Petitioner] removed to India."). As such, just as in *Tazu*, 8 U.S.C. § 1252(b)(9) and (g) prevent this Court from adjudicating Petitioner's claim. *See Tazu*, 975 F.3d at 298–99 ("Re-detaining Tazu was simply the enforcement

mechanism the Attorney General picked to execute his removal. So § 1252(g) funnels review away from the District Court...."); *id.* (finding that because "Tazu's claim ar[ose] out of the action to remove him [,]" "[s]ection 1252(b)(9) also eliminates the District Court's jurisdiction over Tazu's re-detention claim, as it 'arises from' an action taken to execute his removal."); *see also Rranxburgaj v. Wolf*, 825 F. App'x 278, 283 (6th Cir. 2020) ("In the REAL ID Act, Congress decided that, as a matter of public policy, we do not have jurisdiction to decide claims that arise from the decision of the Executive Branch to execute a removal order—like the ones presented in this suit. Accordingly, whether or not we agree with ICE's decision to execute [a] plaintiff's removal order. . . th[at] decision[] [is] not reviewable by" district courts).

Therefore, the Court must DENY Petitioner's Motion, ECF No. 25, insofar as it seeks a P.I. relative to his OSUP revocation and re-detention claim as this Court lacks jurisdiction to adjudicate said claim.[19]

### ii.    Petitioner's *Lucas v. Hadden* Claim

Petitioner contends that he should be granted bond under *Lucas v. Hadden*. ECF No. 26, p. 23. According to Petitioner, bail/bond may be granted where a "a habeas petitioner (1) makes out a clear case for habeas relief on the law and facts, *or* (2) establishes that exceptional circumstances exist warranting special treatment, or both." *Id.* (quoting *Lucas*, 790 F.2d at 367) (quotation marks

---

[19] Because Petitioner's claim "sound[s] in due process, barring all judicial review could raise constitutional concerns. But he can raise all his claims in a petition for review." *Tazu*, 975 F.3d at 299 (citing 8 U.S.C. § 1252(a)(2)(D)). Thus, the Third Circuit explained that "[t]here is no constitutional problem with funneling them [Petitioner's claim] there." *Id.* Indeed, because Petitioner's claim "raise[s] 'constitutional claims or questions of law,' jurisdiction to hear [it] in a petition for review 'is never limited or eliminated.'" *Id.* at 300 (quoting *McAllister v. Attorney General of the United States*, 444 F.3d 178, 183 (3d Cir. 2006)). Counter to fact, if a Petitioner could "restyle any challenge to the three actions listed in § 1252(g) as a...violat[ion of] due process, equal protection, the Administrative Procedure Act, or some other federal law [so that a district court could maintain jurisdiction,] [t]hat would also contravene the Supreme Court's holding...which funneled review even of constitutional challenges into a single petition for review filed with the appropriate court of appeals." *Tazu*, 975 F.3d (citing *Reno*, 525 U.S. at 483) (internal citation omitted). Thus, this Court is prohibited from adjudicating Petitioner's claim relative to ICE's decision to revoke his OSUP and re-detain him in January 2025. Still, the same provisions which strip this Court of jurisdiction, enunciate that jurisdiction exists in other judicial bodies to adjudicate Petitioner's claim.

omitted) (emphasis added) (cleaned up). Petitioner argues that he has satisfied the first prong of *Lucas* as he contends that he is likely to succeed on the merits of both his *Zadvydas* and unlawful OSUP revocation/re-detention claims. *See id.* at pp. 3–14. Additionally, Petitioner argues that his medical conditions satisfy the second prong of *Lucas*. *Id.* at p. 19. Specifically, Petitioner has a medical history of diabetes, hypertension, hyperlipidemia, anxiety, post-traumatic stress disorder, chronic urinary tract infections, colon cancer, gout, and issues with his leg following a serious injury that resulted in multiple surgeries. *Id.* at p. 16. Petitioner alleges both that these medical conditions have worsened due to his detention and that he is not receiving proper medical attention while detained. *Id.* at pp. 16–19.[20] Thus, Petitioner contends that he can satisfy both prongs of *Lucas* and is entitled to bond as a result.

In addition to disputing that Petitioner has demonstrated a likelihood of success on the merits, Respondents challenge the veracity of Petitioner's medical claims by citing and attaching his medical records, which indicate: (1) a disparity between Petitioner's ongoing medical concerns as indicated in filings and those Petitioner has reported to health care professionals providing him treatment while in custody, (2) that he has been provided with medications, (3) that he has received testing, (4) that he has been enrolled in "chronic care," and (5) that he has, at times, refused testing or treatment. ECF No. 28-3; ECF No. 28, pp. 10–11. In addition to alleging that Petitioner's conditions themselves do not constitute exceptional circumstances meriting relief under *Lucas*,

---

[20] In support, Petitioner cites, among other instances, a cardiac evaluation he received in April where the evaluator(s) wrote that Petitioner's blood pressure "should be more closely monitored[,]" that he "should be evaluated for cardiac involvement[,] and [that he] could benefit from a cardiac stress test." ECF No. 26, p. 17, n. 4. Counsel for Petitioner alleges, upon information and belief, that no such cardiac workup has been conducted. *Id.* Respondents counter this information alleging that "[Petitioner]'s physician letter acknowledges that a normal EKG was performed during the chest pain episode" and that "[d]uring a recent encounter with medical staff on or about August 28, 2025, [Petitioner] indicated that he did not have chest pain, and his blood pressure was measured within the normal range." ECF No. 28, p. 11 (citing ECF No. 26-3; ECF No. 28-3).

Respondents also allege that *Lucas* was decided outside the context of immigration detention and should not be applied expansively. *Id.*

### A. Legal Standard

The Third Circuit in *Lucas v. Hadden* discussed "the inherent power of a federal habeas tribunal to admit a *state* petitioner to bail pending a ruling on the claims asserted in the petition," and sought to clarify "the standard under which a district court should evaluate a habeas petitioner's request for bail pending disposition of his petition." 790 F.2d at 367 (emphasis added). In doing so, the Third Circuit noted that "[o]ther courts that have been faced with requests for bail prior to ruling on a habeas petition have developed standards requiring that a habeas petitioner (1) make out a clear case for habeas relief on the law and facts, *or* (2) establish that exceptional circumstances exist warranting special treatment, *or both*." *Id.* (emphasis added) (citing *Eaton v. Holbrook,* 671 F.2d 670, 670 (1st Cir.1982); *Iuteri v. Nardoza,* 662 F.2d 159, 161 (2d Cir.1981); *Calley v. Callaway,* 496 F.2d 701, 702 (5th Cir.1974)). The Third Circuit expressed "doubt that it is appropriate to grant bail prior to ruling on a *state* habeas petition solely on the ground that there is a high likelihood of success on the merits, especially absent exhaustion of state remedies[,]" and thus, the Third Circuit explained that extraordinary circumstances must be demonstrated in order for a habeas petitioner to be afforded bail pending a ruling on the merits of his state petition. *Id.* (emphasis added) ("[A]bsent a showing of extraordinary circumstances, [Petitioner] Lucas was improperly admitted to bail.").

Six years later, in *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992), the Third Circuit further explained the *Lucas* standard. In *Landano*, the Third Circuit reviewed a district court's decision to grant a petitioner bail while his habeas petition was still pending due to both the likelihood of success of his underlying state habeas petition and circumstances which, the

district court determined, "require[d such an] extraordinary form of relief." *Id.* at 1240. The Third Circuit reversed the district court's decision, citing the fact that the petitioner had "not made the necessary showing of exceptional circumstances warranting bail." *Id.* at 1241–42. The Third Circuit also noted that the district court erred when it relied on the petitioner's likelihood of success, or "probable innocence[,]" in granting the petitioner bail because "[t]he Supreme Court has emphasized that even in cases where a clear violation of the petitioner's rights [are] found, 'considerations of federal-state comity would still inhere, and it would be unseemly in our dual system of government for the federal courts to upset a state-court conviction without affording the state courts the opportunity to correct a constitutional violation.'" *Id.* (quoting *Duckworth v. Serrano,* 454 U.S. 1, 4 (1981) and citing *Caswell v. Ryan,* 953 F.2d 853, 857 (3d Cir. 1992) ("[A]s a matter of comity, exhaustion should be strictly adhered to because it expresses respect for our dual judicial system.") (internal quotation marks omitted)). Due to the comity considerations implicated when a federal district court grants a *state* habeas petitioner bail based upon the merits of the claims therein without ruling on the petition, the Third Circuit made clear that "the factual predicate for the exercise of such power [i]s a finding of 'extraordinary circumstances.'" *Id.* at 1239.[21]

In the context of a *federal* habeas petitioner's request to be released on bail pending the adjudication of his underlying petition, however, the Third Circuit has articulated that: "[w]e will

---

[21] "Very few cases have presented extraordinary circumstances, and those that have seem to be limited to situations involving poor health or the impending completion of the prisoner's sentence." *Id.* The Third Circuit has cited *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), as the prime example of an extraordinary circumstance involving a situation of poor health. *Landano*, 970 F.2d at 1230. In *Marsh*, the Third Circuit "found that bail was warranted because the prisoner was 'an advanced diabetic [who] was, under conditions of confinement, rapidly progressing toward total blindness.'" *Id.* (quoting *Marsh*, 227 F.2d at 529). "Notably, [however,] th[at] decision did not place the prisoner at liberty but instead released him to a hospital for immediate treatment." *Id.* Outside of situations involving poor health, extraordinary circumstances appear confined to circumstances where a petitioner's sentence is so short that it would be completed prior to the adjudication of his underlying petition. *Id.* at 1239–40 (citing *Boyer v. City of Orlando*, 402 F.2d 966 (5th Cir. 1968)).

grant a motion for bail pending the disposition of *federal* habeas claims only when the petitioner has raised 'substantial constitutional claims upon which he has a high probability of success, *and* ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective.'" *In re Souels*, 688 F. App'x 134, 135 (3d Cir. 2017) (quoting *Landano*, 970 F.2d at 1239) (emphasis added); *see also United States v. Santiago*, No. 19-1572, 2019 WL 11891950, at *1 (3d Cir. Aug. 1, 2019) (articulating the same standard for federal habeas petitioners). Thus, when a state habeas petitioner seeks bail pending adjudication of his underlying petition, the factual predicate remains the extraordinary circumstances prong, but when the matter involves a federal habeas petitioner, the Third Circuit has made clear that both prongs must be met to justify a grant of bail. *See id.*; *see also Landano*, 970 F.2d at 1239 (articulating as a general standard that: "bail pending post-conviction habeas corpus review [i]s available 'only when the petitioner has [(1)] raised substantial constitutional claims upon which he has a high probability of success, *and also* [(2)] when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective.'") (quoting *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974) (emphasis added)).

## B. Analysis

Here, Petitioner has filed a federal habeas petition. As such, the initial inquiry, or factual predicate, is not whether extraordinary circumstances exist; indeed, the Third Circuit has clearly indicated that Petitioner must satisfy both prongs of the *Lucas* test. *See Landano*, 970 F.2d at 1239; *In re Souels*, 688 F. App'x at 135; *Santiago*, 2019 WL 11891950, at *1. As explained in *supra* Section II.a.i.A.3., Petitioner has failed to demonstrate a likelihood of success on the merits or "substantial constitutional claims upon which he has a high probability of success[.]" *In re Souels*, 688 F. App'x at 135. Thus, Petitioner has failed to satisfy the first prong of the *Lucas* test and

therefore cannot demonstrate that he is entitled to release on bond under *Lucas*.[22] Therefore, Petitioner's alternative request for relief under *Lucas v. Hadden* is DENIED.

### b. Petitioner's Motion to Compel Discovery or Conduct Discovery

Petitioner requests, as an alternative form of relief, that this Court "grant him leave to file a motion to compel discovery under the Federal Rules of Civil Procedure or, in the alternative, leave to conduct discovery under the Habeas Rules[.]" ECF No. 26, p. 24. Specifically, Petitioner seeks:

> (1) reasonable access to Respondents' materials reflecting changed circumstances warranting revocation of [Petitioner]'s release and re-detention on January 26, 2025, (2) reasonable access to Respondents' materials reflecting the statutory and regulatory justification for [Petitioner]'s detention and release, (3) reasonable access to Respondents' materials reflecting [Petitioner] and the agency's efforts to secure a travel document to India or any other country, and (4) the opportunity to depose Supervisory Detention and Deportation Officer Kirby Tejeda; and pursuant to Rule 30(b)(6), the deposition of any ICE officers, directors, agents, or other persons within the agency who can testify as to the apprehension, arrest, and re-detention of [Petitioner], ICE Newark Field Office policies and procedures related to OSUP revocation, and the reasonable foreseeability of [Petitioner]'s removal to India or any third country.[23]

---

[22] Although success on the second prong of the *Lucas* test would prove immaterial to Petitioner's request for relief as he cannot satisfy both requirements a federal habeas petitioner must meet to be afforded bail or bond pending review of his underlying petition, the Court notes that the second prong likewise favors Respondents. Petitioner alleges that his circumstances are extraordinary due to his medical conditions and the treatment—or alleged lack thereof— he is receiving while in ICE custody. ECF No. 26, pp. 16–19. There remains great questions of fact as to what medical conditions are currently ailing Petitioner, the extent of those conditions, and the medical care he is or is not receiving. Respondents have demonstrated that they are both aware of Petitioner's medical conditions and are providing treatment. Further, upon inquiry from the Court at the September 25th hearing as to whether Petitioner was seeking release to pursue either in-patient or out-patient medical treatment, Petitioner's counsel did not indicate that Petitioner would be pursuing either should he be released, but merely indicated that, should he be released on bond, he could pursue whatever treatment may be necessary. Thus, despite Petitioner's claims that he is physically and mentally deteriorating while in custody to the extent that release on bond should be afforded, the Court fails to see how Petitioner's request parallels the release granted in *Marsh* where bond was afforded not to release the petitioner to liberty but to the hospital so that he could receive proper treatment for his diabetes-induced blindness. *See Landano*, 970 F.2d at 1230 (citing *Marsh*, 227 F.2d at 529, as the primary example of an extraordinary circumstance involving a situation of poor health).

[23] This constitutes the summary provided by Petitioner of his discovery requests. Petitioner's specific discovery requests are attached to his brief in support of his Motion, ECF No. 26, as Exhibit F. ECF No. 26-3.

ECF No. 26, p. 25. As such, Petitioner's discovery requests seek information relative to two factual issues: "(1) whether there is a substantial likelihood of removal in the reasonably foreseeable future, and (2) whether Respondents' conduct in revoking [Petitioner]'s OSUP and taking him into custody violated his rights under the Immigration and Nationality Act and its attendant regulations and the Constitution." *Id.*

Respondents contend that discovery is not warranted because Petitioner "has not established good cause to authorize discovery." ECF No. 28, p. 11–13. Further, Respondents contend that Petitioner's discovery requests are: "unnecessary, burdensome," "speculative[,]" "vague[,]" "overly broad[,]" "disproportionate to the needs of [t]his case[,]" and "an impermissible fishing expedition[.]" *Id.* at p. 13. As such, Respondents contend that "the Court should deny [Petitioner]'s motion for discovery." *Id.* at p. 15.

### i.    Legal Standard

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). However, in 1976, the Supreme Court promulgated, and Congress adopted the Rules Governing § 2254 Cases—Rule 6(a) of which provides that:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

*Bracy*, 520 U.S. at 904; *see also Levi v. Holt*, 192 F. App'x 158, 162 (3d Cir. 2006) (noting that Rule 6(a) applies equally to cases brought under 28 U.S.C § 2241 as it does to cases brought under 28 U.S.C. § 2254 by nature of Rule 1(b)). Rule 6(a) was designed to be consistent with the Supreme Court's decision in *Harris v. Nelson*, 392 U.S. 286 (1969), which set forth that "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry" "where specific allegations before the court show reason to believe that the petitioner may, if the facts are

fully developed, be able to demonstrate that he is ... entitled to relief[.]" *Bracy*, 520 U.S. at 908–09 (quoting *Harris*, 392 U.S. at 300) (internal quotation marks omitted). It is through "setting forth [such] specific factual allegations" that a "petitioner may satisfy the 'good cause' standard [of Rule 6(a).]" *Williams v. Beard*, 637 F.3d 195, 209 (3d Cir. 2011); *see also Han Tak Lee v. Glunt*, 667 F.3d 397, 404 (3d Cir. 2012). Yet, even if the petitioner satisfies the "good cause" standard and is entitled to discovery as a result, "the scope of discovery is subject to a district court's sound discretion." *Williams*, 637 F.3d at 209.

    ii.    **Analysis**

Here, Petitioner requests discovery relative to two factual issues: "(1) whether there is a substantial likelihood of removal in the reasonably foreseeable future, and (2) whether Respondents' conduct in revoking [Petitioner]'s OSUP and taking him into custody violated his rights under the Immigration and Nationality Act and its attendant regulations and the Constitution." ECF No. 26, p. 25. For the reasons that follow, the Court will GRANT Petitioner limited discovery under the Federal Rules of Civil Procedure as to the first issue, but the Court will DENY Petitioner's request for discovery as to the second issue.

As to the first issue, Petitioner has set forth specific factual allegations that give the Court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief[.]" *Bracy*, 520 U.S. at 908–09; *Williams*, 637 F.3d at 209; *see also Han Tak Lee*, 667 F.3d at 404. Petitioner has raised a *Zadvydas* claim, alleging that he has been detained for nearly nine consecutive months—a post-removal detention period that exceeds the presumptively reasonable period under *Zadvydas*—and that new evidence demonstrates that his removal is not reasonably foreseeable. ECF No. 26, p. 7. As noted above, Petitioner specifically alleges that his removal is not reasonably foreseeable because: (1) his travel document application

to India was denied as a result of India's inability to verify his nationality and (2) ICE has not indicated that it is considering any other specific countries for his removal. *Id.* at p. 8. In this way, Petitioner has demonstrated good cause to believe that, depending on the status of repatriation negotiations between HQ-RIO and India, he "may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief[.]" *Bracy*, 520 U.S. at 908–09. As such, Petitioner is entitled to discovery as to the limited issue of the foreseeability of his removal from the country. *See Bracey*, 520 U.S. at 909 ("It may well be…that petitioner will be unable to obtain evidence sufficient to support…his case, but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish 'good cause' for discovery.").[24]

However, the Court will DENY Petitioner's request for discovery relative to "whether Respondents' conduct in revoking [Petitioner]'s OSUP and taking him into custody violated his rights under the Immigration and Nationality Act and its attendant regulations and the Constitution." ECF No. 26, p. 25. As explained above, *see supra* Section II.a.i.B.2., this Court does not have jurisdiction to adjudicate Petitioner's claim that ICE's decision to revoke his OSUP and re-detain him in January 2025 violated the INA, APA, and Due Process. *See* 8 U.S.C. §

---

[24] In granting Petitioner's discovery request as to the foreseeability of his removal, the Court directs both parties' attention to this Court's procedures regarding discovery disputes. *See* https://www.pawd.uscourts.gov/content/stephanie-l-haines-district-judge (Initial Scheduling Order and Interim Standing Order).

> In the event a dispute arises over a discovery request, all counsel are required to confer in good faith in an effort to resolve the issue without court intervention. It shall be the obligation of the attorney for the party seeking court intervention to initiate such conferences and to do so promptly. Refusal to confer in good faith may subject counsel to sanctions, such as the imposition of costs, including the attorneys' fees of opposing counsel, under FED. R. CIV. P. 37(a)(5). In the event, however, that the parties to this action are unable to informally resolve a discovery dispute and court intervention is sought, the parties are to contact Chambers to schedule a telephonic conference to discuss the discovery dispute. No discovery related motions are to be filed until after the conference.

*Id.* at Initial Scheduling Order. Additionally, while the Court has permitted limited discovery as to this narrow issue, Respondents may, once the proper procedures outlined above have been followed, assert any objections to specific discovery requests that the parties are unable to rectify on their own.

1252(b)(9) and (g). Because this Court lacks jurisdiction to adjudicate Petitioner's OSUP revocation and re-detention claim, Petitioner is unable to demonstrate that he is entitled to relief as to that issue, even if the facts are fully developed. *See Bracy*, 520 U.S. at 908–09. Therefore, the Court must DENY Petitioner's Motion in so much as it requests discovery on the issue of his OSUP revocation and re-detention.

### III.    Conclusion

As outlined above, Petitioner's instant Motion includes a Motion for Reconsideration, a Renewed Motion for a P.I., and a Motion to Compel or Conduct Discovery.

Petitioner's Motion for Reconsideration and Renewed Motion for a P.I. hinge on the same law and facts. *See supra* Section II.a. As such, the Court addressed both in one breath. *Id.* First, relative to Petitioner's *Zadvydas* claim, Petitioner failed to demonstrate a likelihood of success on the merits due to Respondents' representations from HQ-RIO that diplomatic, repatriation negotiations with India are underway once again and are bearing fruit. ECF No. 28-2. *See supra* Section II.a.i.A.3. Second, relative to Petitioner's OSUP revocation and re-detention claim, 8 U.S.C. §1252(b)(9) and (g) strip this Court of jurisdiction to adjudicate the issue as ICE's decision to revoke Petitioner's OSUP and re-detain him so that it may execute his final order of removal is clearly an action taken to execute removal. *See supra* Section II.a.i.B.1. Finally, relative to Petitioner's request for release on bond under *Lucas v. Hadden*, the Third Circuit has set forth two requirements that federal habeas petitioner must satisfy in order to be released on bond while their underlying habeas petitions are adjudicated on the merits; however, Petitioner does not satisfy the necessary requirements. *See supra* Section II.a.ii.B. As such, the Court will DENY Petitioner's Motion as to his Motion for Reconsideration and his Renewed Motion for a P.I.

Petitioner's Motion to Compel Discovery or Conduct Discovery seeks discovery as to two limited issues: "(1) whether there is a substantial likelihood of removal in the reasonably foreseeable future, and (2) whether Respondents' conduct in revoking [Petitioner]'s OSUP and taking him into custody violated his rights under the Immigration and Nationality Act and its attendant regulations and the Constitution." ECF No. 26, p. 25. Because Plaintiff demonstrated good cause to believe that he "may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief[,]" *Bracy*, 520 U.S. at 908–09, relative to the issue of the foreseeability of his removal, the Court will GRANT his Motion in so much as it requests discovery on that issue. *See supra* Section II.b.ii. However, because this Court lacks jurisdiction to adjudicate Petitioner's OSUP revocation and re-detention claim, Petitioner is unable to demonstrate that he is entitled to relief as to that issue, even if the facts are fully developed; therefore, the Court will DENY his Motion in so much as it requests discovery on the issue of his OSUP revocation and re-detention. *See supra* Section II.b.ii.

An appropriate Order follows.

DATED: October 30, 2025

STEPHANIE L. HAINES
U.S. DISTRICT COURT JUDGE